John Franklin WILLIAMS, Peter Martin Williams, and James Oliver Williams, Plaintiffs,

v.

SECURITY NATIONAL BANK OF SIOUX CITY, Iowa, Defendant.

No. C 03–4034–MWB.

United States District Court, N.D. Iowa, Western Division.

Feb. 25, 2005.

Dana A. Dwiggins, Mark A. Solomon, Lionel, Sawyer & Collins, Las Vegas, NV, Jay Elliott Denne, Stanley E. Munger, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiffs.

Glianny Fagundo–Toro, Michael P. Bruyere, Lord, Bissell & Brook, Atlanta,

GA, Maurice B. Nieland, Rawlings Neiland Probasco Killinger Ellwanger Jacobs, et al., Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' MOTIONS IN LIMINE**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................787

II. *LEGAL ANALYSIS* ...............................................787
   A. *SNB's Motions* ............................................787
      1. *References to insurance* ...........................787
         a. *Arguments of the parties*......................788
         b. *Analysis* .....................................788
      2. *References to settlement negotiations*.............789
         a. *Arguments of the parties*......................789
         b. *Analysis* .....................................789
      3. *Mr. Cain's "conclusions" or "opinions"* ...........790
         a. *Arguments of the parties*......................790
         b. *Analysis* .....................................791
      4. *Revision of internal policies* .....................793
         a. *Arguments of the parties*......................793
         b. *Analysis* .....................................794
            i. *Rule 407* .................................794
            ii. *The "feasibility of precautionary measures" exception* .......794
            iii. *Applicability of the exception* ...........795
      5. *Amendment of the probate petition* ...............796
         a. *Arguments of the parties*......................796
         b. *Analysis* .....................................797
      6. *Growth of trust principal* .......................798
         a. *Arguments of the parties*......................798
         b. *Analysis* .....................................798
      7. *The relationship between Doug Palmer and Charles Williams* .......800
         a. *Arguments of the parties*......................800
         b. *Analysis* .....................................801
      8. *SNB's corporate relationship to Security National Corporation* .......801
         a. *Arguments of the parties*......................802
         b. *Analysis* .....................................802
      9. *Stock indices* ...................................803
         a. *Arguments of the parties*......................803
         b. *Analysis* .....................................804
      10. *Expert testimony of Todd Borton* .................805
         a. *Arguments of the parties*......................805
         b. *Analysis* .....................................806
      11. *Expert testimony of Dominic Campisi* .............808
         a. *Arguments of the parties*......................809
         b. *Analysis* .....................................809
   B. *The Remainder Beneficiaries' Motions* ...................810
      1. *Offset of sums the income beneficiary could have claimed* ............810
         a. *Arguments of the parties*......................811
         b. *Analysis* .....................................812
      2. *Offset of trustee fees* ...........................815
         a. *Arguments of the parties*......................815
         b. *Analysis* .....................................815

III. *CONCLUSION* ..................................................816

## I. INTRODUCTION

In a Complaint filed May 1, 2003, Remainder Beneficiaries of the so-called DPW Trust, plaintiffs John Franklin Williams, Peter Martin Williams, and James Oliver Williams, assert various claims premised on alleged mismanagement of the DPW Trust by defendant Security National Bank (SNB).[1] The Remainder Beneficiaries assert eight claims. **Count I** is a claim for outright distribution of the DPW Trust to the Remainder Beneficiaries. In this Count, the Remainder Beneficiaries allege that, when Charles Williams, the income beneficiary of the DPW Trust, died on May 7, 2002, the Remainder Beneficiaries became entitled to distribution of the remainder of the Trust. **Count II** is a claim for breach of fiduciary duty. This claim alleges that SNB breached its fiduciary duty by improperly treating the return of over $1.70 million in capital of Pritchard Investment Company (PICO) as income to the Trust, then distributing that sum to the income beneficiary, Charles Williams. **Count III** is another claim for breach of fiduciary duty, this time alleging that SNB improperly favored the income beneficiary over the Remainder Beneficiaries. **Count IV** is a claim for breach of fiduciary duty by self-dealing. This claim alleges that SNB paid estate taxes for Charles Williams's estate from the DPW Trust, then failed to offset those payments against sums that Charles Williams should have paid back to the DPW Trust for the overdistribution of the PICO receipts. **Count V** is a claim for breach of fiduciary duty by paying estimated estate taxes on amounts not received by the DPW Trust. **Count VI** is a claim for breach of fiduciary duty for self-serving conduct in liquidating the assets of the DPW Trust other than SNB's own securi-ties to pay estimated estate taxes. **Count VII** is a claim for breach of SNB's fiduciary duty to account to the Remainder Beneficiaries and to keep them informed. Finally, **Count VIII** is a claim for "statutory liability" pursuant to Iowa Code § 633.4605 alleging that SNB committed a "breach of trust" by concealing or disposing of trust property in bad faith.

SNB answered the Complaint on July 7, 2003, denying the Remainder Beneficiaries' claims. Although SNB originally asserted various counterclaims, those counterclaims were dismissed, in their entirety, by order dated November 6, 2003. On January 9, 2004, SNB also filed a third-party complaint against John F. Pritchard, Jr., a co-trustee of the DPW Trust, but SNB voluntarily dismissed its third-party complaint without prejudice on March 11, 2004. On September 15, 2004, SNB filed a Motion For Partial Summary Judgment seeking judgment in its favor on Counts I, III, IV, V, VI, VII, and VIII of the Complaint. However, the court summarily denied SNB's motion for partial summary judgment on February 15, 2005.

This matter is set for trial beginning on March 7, 2005. In anticipation of trial, the parties have filed a total of thirteen motions in limine. The court will consider the motions in turn, beginning with SNB's motions.

## II. LEGAL ANALYSIS

### A. SNB's Motions

#### 1. References to insurance

The first motion now before the court is SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Insurance (docket no. 129). The Remainder Beneficiaries filed a "limited" resis-

---

1. Although the Complaint originally named Security National Corporation as a defendant, Security National Corporation has since been dismissed from this action.

tance to this motion on February 11, 2005 (docket no. 158).

### a. Arguments of the parties

In support of this motion, SNB contends that knowledge of insurance or the absence of insurance would induce the jury to decide the case on an improper basis. SNB also contends that its insurance coverage is irrelevant to any issues in this case. In their "limited" resistance, the Remainder Beneficiaries agree that evidence of insurance is not admissible to show liability, but they nevertheless contend that a letter from SNB to its insurer is admissible here to show SNB's efforts to minimize its own liability by attempting to legitimize its erroneous distributions to Charles Williams. The Remainder Beneficiaries explain that, in the letter they intend to offer into evidence, SNB states that its interests are closely associated with the Trust so that defending the Trust would not be adverse to the bank. Because the Remainder Beneficiaries do not intend to proffer this letter for the purpose of showing SNB's negligence, the Remainder Beneficiaries contend that the letter is admissible.

### b. Analysis

■ Rule 411 of the Federal Rules of Evidence provides as follows:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

FED. R. EVID. 411. The purpose of the rule is "to avoid the possibility of prejudice to the insured party." *Ouachita Nat'l Bank v. Tosco Corp.*, 686 F.2d 1291, 1301 (8th Cir.1982). "In this regard, it is generally thought that the jury's knowledge that a plaintiff is receiving insurance benefits, or that a defendant is carrying liability insurance, might serve to decrease or increase, respectively, the amount of damages awarded by a jury." *Id.; accord Higgins v. Hicks Co.*, 756 F.2d 681, 685 (8th Cir. 1985) (the concern of Rule 411 is that " 'knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds' ") (quoting Advisory Committee Notes to Rule 411). "However, it is established that the existence of liability insurance may be used for some purposes, such as showing the possible bias of a witness." *Id.; Morrissey v. Welsh Co.*, 821 F.2d 1294, 1305 (8th Cir.1987) ("[N]ot every reference to insurance constitutes reversible error."). Thus, where evidence of a defendant's liability insurance is irrelevant to any issues in the case, the evidence may properly be excluded. *Higgins,* 756 F.2d at 685. On the other hand, evidence of liability insurance may properly be admitted if it is relevant to an issue in the case or if it is offered to prove bias or prejudice of a witness. *Id.* at 684–85.

■ In this case, Rule 411 supports SNB's general request to exclude evidence that it carried liability insurance. FED. R. EVID. 411. On the other hand, the Remainder Beneficiaries are not offering the letter containing a reference to SNB's insurance for the purpose of showing that SNB had liability insurance, but for the tangential purpose of showing that SNB minimized its conduct in representations to its insurer. Thus, the concerns of Rule 411 are only marginally implicated by the letter, because the inferential notice that SNB has insurance, which the letter might provide, is not the primary purpose for proffering the letter and, just as importantly, that inferential notice that SNB has insurance is unlikely to induce jurors to

find against SNB. *See Higgins*, 756 F.2d at 685 (the concern of the rule is that knowledge of insurance will induce the jurors to decide cases on improper grounds); *Ouachita Nat'l Bank*, 686 F.2d at 1301 (the concern of the rule is that knowledge of liability insurance or receipt of insurance benefits may increase or decrease a jury's damages award). Because the letter is relevant to the issue of SNB's minimization of its conduct, and there is little danger that the tangential reference to the fact that SNB had insurance coverage will foster a decision by the jury on an improper basis in this context, the letter will not be excluded. *Id.* (evidence of insurance may properly be admitted if it is relevant to the case); *Ouachita Nat'l Bank*, 686 F.2d at 1301 (evidence of insurance may be admitted for a purpose other than to imply that damages should be increased or decreased because a party was insured). Any danger that the tangential reference to the fact that SNB had insurance could also be mitigated by a limiting instruction concerning the proper use of the letter that the Remainder Beneficiaries intend to offer into evidence.

Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To Defendant's Insurance (docket no. 129) will be denied, where the only evidence of SNB's insurance that the Remainder Beneficiaries intend to offer is relevant to issues in the case, and that evidence is not offered merely to imply that damages should be increased or decreased because SNB had insurance. SNB may, however, request a limiting instruction on the letter from SNB to its insurer that the Remainder Beneficiaries intend to offer into evidence.

### 2. *References to settlement negotiations*

SNB's next motion is its February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Settlement Agreements (docket no. 130). The Remainder Beneficiaries responded to this motion on February 11, 2005 (docket no. 155).

### a. *Arguments of the parties*

SNB argues that evidence of settlement negotiations is generally inadmissible pursuant to Rule 408 of the Federal Rules of Evidence. Moreover, SNB asserts that the parties agreed that settlement negotiations would be kept confidential. In their response, the Remainder Beneficiaries state that they resist the motion only because no settlement agreements have been reached between the parties in this case, so there is no evidence to preclude. However, the Remainder Beneficiaries also agree that any evidence of settlement negotiations between the parties and any testimony relating to such negotiations is irrelevant and inadmissible, where the parties have agreed that prior settlement negotiations and any future settlement negotiations will remain confidential.

### b. *Analysis*

■ In light of the Remainder Beneficiaries' response, analysis of this over-protective motion in limine can be brief. Rule 408 expressly provides that evidence of furnishing, offering, promising, or accepting a settlement is not admissible to prove the validity of any claim, and that evidence of conduct or statements made in settlement negotiations "is likewise not admissible." Fed. R. Evid. 408. No party has suggested that any evidence of settlement offers or negotiations is admissible for any other purpose. *Id.* (noting this exception). Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Settlement Agreements (docket no. 130) will be granted.

### 3. Mr. Cain's "conclusions" or "opinions"

SNB's next motion is its February 1, 2005, Motion In Limine To Preclude Reference To Notes And Observations Of Paul Cain As Opinions Or Conclusions (docket no. 131). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 163). At issue in this motion are various notes and observations by Paul Cain, an accountant with McGladrey & Pullen, L.L.P. SNB hired McGladrey & Pullen in January 2003 to review account activity in the DPW Trust to determine, among other things, whether Trust tax returns were properly completed. Mr. Cain was primarily responsible for such reviews, but SNB contends that he never completed the task or formed any opinions about any matter. Rather, he provided no more than a "progress report" to SNB. SNB seeks to exclude any references to Mr. Cain's comments or notes as embodying "opinions" or "conclusions."

#### a. Arguments of the parties

Although SNB may call Mr. Cain as a fact witness, SNB contends that, on cross-examination, the Remainder Beneficiaries should be barred from referring to Mr. Cain's statements during a conference call with SNB representatives and in various documents that he provided to SNB as "opinions" or "conclusions." Such a characterization, SNB contends, would be misleading or confusing to the jury, even if Mr. Cain could be qualified as an expert under Rule 702 of the Federal Rules of Evidence, because he provided no "reliable" conclusions, where he has admitted that he lacked sufficient facts on which to base any conclusions. Furthermore, SNB contends that Mr. Cain never reached an expert opinion within the contemplation of Rule 702, so that any suggestion that he did so would be unfairly prejudicial to SNB. Finally, SNB contends that Mr. Cain's comments do not satisfy Rule 702's "reliability" requirements, where Mr. Cain stated plainly that he did not have enough information to reach any conclusions.

The Remainder Beneficiaries contend that Mr. Cain reviewed and analyzed information he received from SNB and ultimately advised SNB as to the "most reasonable" classification of the disputed receipts from PICO, a family-owned company. The Remainder Beneficiaries contend that Mr. Cain's advice amounts to an "opinion," even if it was only preliminary or incomplete. The Remainder Beneficiaries contend, further, that even lay persons may state "opinions" under Rule 701 of the Federal Rules of Evidence. However, the Remainder Beneficiaries contend that the critical issue is not whether or not Mr. Cain was an "expert," but what Mr. Cain told SNB. The Remainder Beneficiaries explain that they intend to offer evidence that Mr. Cain advised SNB about what would be the "most reasonable" classification of the sums received by the Trust from PICO to show what SNB knew at the time that SNB made allegedly false and misleading disclosures to the Remainder Beneficiaries and to the Iowa Probate Court. In essence, the Remainder Beneficiaries contend that Mr. Cain is not being offered as an "expert" witness at all, but as a "fact" witness concerning what SNB had been told about the "most reasonable" classification of the PICO assets.

Even if Mr. Cain is treated as an expert, however, the Remainder Beneficiaries argue that SNB's complaints about the incompleteness of his opinions or the lack of sufficient information to support them would go to the weight of his "expert" opinions, not their admissibility, where there is some support for those opinions. The Remainder Beneficiaries also contend that SNB cannot be "surprised" by any of Mr. Cain's comments, where SNB retained

Mr. Cain for the very purpose of providing those comments. Under these circumstances, the Remainder Beneficiaries contend that the concerns of Rule 702 are not implicated.

### b. Analysis

Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. SNB contends that any "expert" opinion by Mr. Cain would fail at least the first and possibly the second requirement of the rule, because Mr. Cain conceded that he did not have sufficient facts or data to reach any reliable "final" conclusion or opinion. However, the court is not convinced that the present evidentiary dispute has anything at all to do with Rule 702. Rather, this court concludes that the present evidentiary dispute concerns the admissibility of "fact" testimony from a person who could, perhaps, have been qualified to give "expert" testimony. The court finds that the proper resolution of that dispute is, therefore, controlled by Rule 403 rather than Rule 702.

The Eighth Circuit Court of Appeals has recognized the distinction between persons testifying as "experts" and persons with "expert" qualifications who testify as "fact witnesses" in a particular case. For example, in *Long v. Cottrell, Inc.*, 265 F.3d 663 (8th Cir.2001), the plaintiffs asserted that they were entitled to a new trial, because the trial court had allowed the defendant's vice-chairman to testify despite the defendant's failure to disclose him as an expert. *Long*, 265 F.3d at 668. The trial court had denied the plaintiffs' new trial motion, because the trial court found that the witness had testified as a "fact witness only," and did not testify as an "expert." The appellate court agreed, holding that, even if the witness had testified in numerous other products liability cases, his testimony in the case then before the court was not "expert in nature." Instead, the witness had "testified based on his first-hand experience from working in the industry and his involvement in [the defendant's] design and testing processes." To the extent that the witness had purportedly testified on the "state of the art in the industry," the court also concluded that "his testimony was based on his personal knowledge and was not in the form of expert opinion." Similarly, his testimony about what other manufacturers in the industry were doing "was expressly limited to his own knowledge and experience." *Id.* at 668–69. Thus, even a witness who appears to be an "expert" in a particular field may actually testify only as a "fact witness" in a particular case.

In another instructive case, *Easley v. Anheuser–Busch, Inc.*, 758 F.2d 251 (8th Cir.1985), the Eighth Circuit Court of Appeals concluded that the district court had erred by preventing in-house experts from testifying as "fact witnesses," even though the trial court had properly excluded their "expert" testimony as a sanction for failure to comply with discovery. *Easley*, 758 F.2d at 258. The appellate court concluded that exclusion of the "fact" testimony of these in-house experts was inappropriate, despite "the difficulty of separating statements about actions taken as in-house experts from what would essentially be expert opinion testimony," because exclusion of the "fact" testimony had apparently pre-

cluded the proffering party "from presenting some admissible evidence." The appellate court concluded that, at least in a bench trial, the better course "would have been to hear the testimony, and continue to sustain objections [to 'expert' testimony] when appropriate." *Id.*

■ In the present case, it is clear that Mr. Cain could have been qualified as an "expert," because as an accountant, he had the sort of specialized knowledge that could assist the trier of fact to understand certain kinds of financial records or evidence, *see* FED. R. EVID. 702 (defining expert testimony), but he was not so designated in this case. On the other hand, it is equally clear that the testimony that the Remainder Beneficiaries intend to elicit from Mr. Cain is actually "fact witness" testimony, not testimony that is "expert in nature." *See Long*, 265 F.3d at 668–69 (recognizing this distinction in the testimony of a person who could have been qualified as an "expert" and who had testified as an expert in other litigation); *Easley*, 758 F.2d at 258 (also recognizing that "fact" testimony may be presented by a person precluded from testifying as an "expert"). The testimony that the Remainder Beneficiaries plan to elicit is testimony based on Mr. Cain's own personal knowledge about what he told SNB about the "most reasonable" classification of the PICO assets. *Id.* at 668 (testimony from first-hand knowledge and experience was not "expert" testimony). Moreover, exclusion of testimony concerning what Mr. Cain told SNB would be inappropriate, because it would apparently preclude the Remainder Beneficiaries "from presenting some admissible evidence" about what SNB knew or had been advised at certain times in relation to conduct by SNB that the Remainder Beneficiaries contend constituted a breach of fiduciary duty or was otherwise wrongful. *See Easley*, 758 F.2d at 258 (also finding admissible on this

ground "fact" testimony from a witness barred from providing "expert" testimony).

To put it another way, Mr. Cain's evidence is admissible pursuant to Rules 401 and 402 of the Federal Rules of Evidence, because it is probative of what SNB knew or had been advised about the "proper classification" of the PICO assets at the time that it took certain actions or made certain representations in relation to those assets. *See* FED. R. EVID. 401 (defining "relevant evidence"); FED. R. EVID. 402 (providing that relevant evidence is generally admissible). The court concludes, further, that this evidence should not be excluded pursuant to Rule 403, because the probative value of what Mr. Cain told SNB outweighs the potential for prejudice, confusion, or misleading the jury about which part of his testimony might be "expert" testimony within the meaning of Rule 702 and what might be "fact" testimony. *See* FED. R. EVID. 403 (allowing the court to exclude relevant evidence if its probative value is substantially outweighed, *inter alia*, by its potential for unfair prejudice, confusion of the issues, or misleading the jury). As in *Easley*, the court concludes that the potential difficulties in separating statements about what information Mr. Cain provided to SNB (*i.e.*, "fact" testimony) from statements suggesting his "expert" opinion about the proper classification of the PICO assets do not justify excluding Mr. Cain's testimony. Rather, the Remainder Beneficiaries are entitled to present to the jury Mr. Cain's testimony about what "opinions" or advice he gave SNB, even if the opinions or advice were only tentative or preliminary, to show what SNB knew or had been advised. *See Easley*, 758 F.2d at 258 (difficulties in distinguishing between "fact" and "expert" testimony did not warrant excluding all testimony of in-house experts barred from giving "expert" testimony). Although this case involves a jury trial,

and *Easley* involved a bench trial, the court concludes that Mr. Cain's testimony should be taken subject to timely objections to improper "expert" testimony, because the court can and will, if necessary, instruct the jury on the proper purposes for which any evidence may be considered. *Cf. id.* (in a bench trial, the court should have taken the in-house experts' testimony subject to objections concerning improper "expert" opinions). SNB will, in its turn, be entitled to attempt to elicit from Mr. Cain testimony about the "preliminary" or "incomplete" nature of his investigations and opinions and the lack of sufficiency of the information he reviewed to reach a final "expert" opinion, but that evidence will go primarily to the weight that SNB should or should not have given to Mr. Cain's opinions at the time, whether or not Mr. Cain was ultimately right about the proper classification of the assets in question.

Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Reference To Notes And Observations Of Paul Cain As Opinions Or Conclusions (docket no. 131) will be denied.

### 4. Revision of internal policies

On February 1, 2005, SNB also filed a Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Subsequent Modifications To Its Internal Policies (docket no. 132). This motion involves SNB's modification of its internal policies regarding (1) the treatment of incoming monies as income versus principal; and (2) receipt of trust statements by trust remaindermen. The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 159).

### a. Arguments of the parties

SNB contends that the Remainder Beneficiaries should not be allowed to present the evidence that SNB subsequently changed certain pertinent policies in an attempt to prove that. SNB's actions at issue in this litigation were culpable. SNB contends, first, that evidence of such remedial measures should be excluded pursuant to Rule 407 of the Federal Rules of Evidence. SNB asserts that there is no dispute that it controlled the trust, no assertion that its previous policies were not feasible, and no "impeachment" purpose to such evidence. SNB also argues that it would be inappropriate to create a disincentive to trustees to take remedial measures. SNB argues, second, that the evidence should be excluded pursuant to Rule 403, because it would be unfairly prejudicial to SNB, confuse the issues, and mislead the jury. Somewhat more specifically, SNB contends that it would be prejudiced by an improper inference from this evidence that it had acted culpably in this case.

In their resistance, the Remainder Beneficiaries argue that Rule 407 does not preclude the use of subsequent remedial measures when offered to show the feasibility of precautionary measures, if controverted, and that the probative value of such evidence outweighs its prejudicial effect under Rule 403. As to admissibility under Rule 407, the Remainder Beneficiaries point out that the rule expressly authorizes the admission of evidence of remedial measures, *inter alia*, for the purpose of "proving the feasibility of precautionary measures, if controverted." Here, the Remainder Beneficiaries point out that SNB contends only that it has not controverted the feasibility of its *previous* policies, but has never admitted the feasibility of the remedial measures. Consequently, the Remainder Beneficiaries argue that SNB's failure to address the feasibility of precautionary measures means that SNB controverts the feasibility of those measures. The Remainder Beneficiaries also assert that they will claim that SNB's policies at

the time were inadequate and that better policies were feasible. Finally, the Remainder Beneficiaries argue that, under the circumstances, the probative value of evidence that SNB subsequently took remedial measures outweighs any potential for prejudice from such evidence.

### b. Analysis

**i. Rule 407.** Rule 407 of the Federal Rules of Evidence provides as follows:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, *evidence of the subsequent measures is not admissible to prove negligence, culpable conduct,* a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule *does not* require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or *feasibility of precautionary measures, if controverted,* or impeachment.

FED. R. EVID. 407 (emphasis added). As the Tenth Circuit Court of Appeals has noted, "the rule has two justifications": (1) "subsequent remedial measures are of limited probative value as an admission of fault"; and (2) "exclusion of remedial measures favors 'a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety.'" *Meller v. Heil Co.,* 745 F.2d 1297, 1299 (10th Cir.1984) (quoting FED. R. EVID. 407, Advisory Committee Note, 1972 Proposed Rule). Thus,

> [w]hile Rule 407 recognizes the importance of encouraging safety improvements, it also recognizes that this salutory social policy must be balanced against competing interests. Chief among these other interests is the admission of relevant, probative evidence. Rule 407 strikes a balance by excluding subsequent remedial measures only when

used as evidence of the defendant's "negligence or culpable conduct." It permits introduction of such measures to prove other controverted issues, provided that introduction of this evidence meets the remaining admissibility requirements of the Federal Rules of Evidence.

*Meller,* 745 F.2d at 1299–1300 (footnotes omitted).

While SNB asserts that the general rule of exclusion, in the first sentence of the rule, applies here, the Remainder Beneficiaries contend that an exception, stated in the second sentence, applies here. More specifically, the Remainder Beneficiaries contend that the "feasibility of precautionary measures, if controverted" exception applies to the remedial measures taken by SNB. Therefore, the court must explore the meaning of this exception.

**ii. The "feasibility of precautionary measures" exception.** "[E]xceptions to the rule are to be narrowly read in order to preserve the 'important policy of encouraging subsequent remedial measures.'" *Albrecht v. Baltimore & Ohio R. Co.,* 808 F.2d 329, 332 (4th Cir.1987) (quoting *Werner v. Upjohn Co., Inc.,* 628 F.2d 848, 856 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981)). The exception upon which the Remainder Beneficiaries rely has two parts: (1) "feasibility" of the remedial measure and (2) "controversion" of that feasibility. *Id.; Raymond v. Raymond Corp.,* 938 F.2d 1518, 1523 (1st Cir.1991) ("This exception only applies if feasibility is controverted.") (citing cases). As the Advisory Committee explained at the time that the rule was proposed, "The requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and allows the opposing party to lay the groundwork for exclusion by making an admission." FED.

R. EVID. 407, Advisory Committee Notes, 1972 Proposed Rules. Therefore, "[i]t is not for the plaintiff to put feasibility in issue, for feasibility is not in issue unless and until controverted by the defendant." *Albrecht,* 808 F.2d at 331.

■ The Eighth Circuit Court of Appeals has defined "feasibility" within the meaning of Rule 407 as follows:

> Whether something is feasible relates not only to actual possibility of operation, and its cost and convenience, but also to its ultimate utility and success in its intended performance. That is to say, "feasible" means not only "possible," but also means "capable of being ... utilized, or dealt with successfully." *Webster's Third New International Dictionary* 831 (unabridged ed.1967); *see Black's Law Dictionary* 549 (5th ed.1979) ("reasonable assurance of success."). *See also American Airlines, Inc. v. United States,* 418 F.2d 180, 196 (5th Cir.1969) (defendant's witness had testified that an airplane altimeter in issue was "feasible and safe and that there was no reason to change it"; plaintiff allowed to show that defendant changed altimeter design after crash).

*Anderson v. Malloy,* 700 F.2d 1208, 1213 (8th Cir.1983). Thus, an opposing party "controverts" feasibility when that party testifies, in effect, that a device or procedure was not "capable of being utilized or dealt with successfully." *Id.* at 1214.

*iii. Applicability of the exception.* SNB has never asserted or presented any evidence that the remedial procedures that it subsequently adopted were not "capable of being utilized or dealt with successfully." *Id.* However, the Remainder Beneficiaries contend that the feasibility of the remedial measures must nevertheless be deemed to be "controverted," where SNB argued only that it did not controvert the feasibility of the *previous* measures. The Remainder Beneficiaries argue, further, that SNB's "controversion" can be inferred from SNB's failure to address the feasibility of *subsequent* precautionary measures.

■ The court finds that, in SNB's motion, SNB inexplicably applied the "controversion" requirement to the wrong measures, the *previous measures.* However, the question under Rule 407 is whether the opposing party controverts or admits *the feasibility of the precautionary measures,* not whether SNB controverts or admits the feasibility of the measures in place at the time of the allegedly culpable conduct. *See* FED. R. EVID. 407 ("The rule does not require the exclusion of evidence of subsequent measures when offered ... as proving ... feasibility of *precautionary* measures, *if controverted.*") (emphasis added). Nevertheless, the court concludes that SNB's confusion about what must be controverted is simply not a reasonable basis on which to deem SNB to have controverted the feasibility of the precautionary measures.

Nor is the court persuaded by the Remainder Beneficiaries' argument that SNB has controverted feasibility by not responding to the Remainder Beneficiaries' attempt to put feasibility at issue. This is so, notwithstanding that the Tenth Circuit Court of Appeals held in *Meller v. Heil Co.,* 745 F.2d 1297 (10th Cir.1984), found that the feasibility of precautionary measures was controverted simply because the opposing party had not made an "unequivocal admission of feasibility." *Meller,* 745 F.2d at 1300 n. 7. In *Meller,* the defendant did not attempt to rebut the plaintiff's proof of the feasibility of precautionary measures. The court noted that the plaintiff bore the burden of proving that the defendant's product was "unreasonably dangerous" and that the feasibility of alternative designs was a factor essential to the plaintiff's theory of "unreasonable danger." *Id.* Because the defendant did not

stipulate that the alternative designs were feasible, the court found that the plaintiff was "obligated to prove this element of her case." Under such circumstances, the court concluded that "the defendant [could not] assert that, because it did not attempt to rebut the plaintiff's proof, the issue was not controverted at trial." Therefore, the court concluded that "the feasibility of an alternative design is deemed controverted unless the defendant makes an unequivocal admission of feasibility." *Id.* (citing in support the Advisory Committee's note that "[t]he requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and *allows the opposing party to lay the groundwork for exclusion by making an admission*") (emphasis added by the *Meller* court).

This court does not agree that, in the circumstances of this case, SNB was required to make an "unequivocal admission of feasibility" or be deemed to have controverted the feasibility of the precautionary measures at issue. First, this is not a case involving a negligent design or any requirement that the plaintiff prove that the defendant's conduct or product was "unreasonably dangerous." Nor are the Remainder Beneficiaries otherwise compelled to prove the feasibility of other procedures in SNB's handling of trust assets or statements to remaindermen. Finally, the Advisory Committee's comment that Rule 407 "*allows* the opposing party to lay the groundwork for exclusion by making an admission," FED. R. EVID. 407, Advisory Committee Notes, 1972 Proposed Rule (emphasis added), is in *permissive* terms, so that it simply does not warrant an inference that a party that does not stipulate to feasibility or attempt to rebut the opposing party's evidence of feasibility must be *deemed* to have controverted feasibility. Thus, this case fits within the general rule that "[i]t is not for the plaintiff to put feasibility in issue, for feasibility

is not in issue unless and until controverted by the defendant." *See Albrecht,* 808 F.2d at 331.

Because SNB has not expressly controverted the feasibility of its subsequent remedial measures, and cannot be deemed to have done so, evidence of those remedial measures is not admissible pursuant to Rule 407 unless and until SNB *does* controvert feasibility. *See Raymond,* 938 F.2d at 1523 ("This exception only applies if feasibility is controverted.") (citing cases). Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Subsequent Modifications To Its Internal Policies (docket no. 132) will be granted.

### 5. Amendment of the probate petition

The fifth motion now before the court is SNB's February 1, 2005, Motion In Limine To Bar Plaintiffs From Introducing Any Evidence Of Defendant's First Amended Iowa Probate Court Petition (docket no. 133). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 161).

#### a. Arguments of the parties

SNB anticipates that the Remainder Beneficiaries will attempt to introduce into evidence SNB's first amended petition in what the parties have called the "Iowa Probate Action" in state court to imply that SNB intentionally provided inaccurate information to that court. However, SNB contends that such evidence should be excluded, because it is irrelevant to this case, the inferences the Remainder Beneficiaries seek to assert are wholly unsupported by the facts in the record, and admission of the evidence of the amended petition would, consequently, be unfairly prejudicial to SNB. SNB professes its entire good faith in amending its state-court petition.

The Remainder Beneficiaries, however, assert that admission of the amended petition would be proper; indeed, they contend that failure to do so would be tantamount to precluding them from proving an element of their claim of breach of fiduciary duty. The Remainder Beneficiaries contend that, for over eight years after discovering the overdistribution to Charles Williams of Trust receipts from the PICO liquidation, SNB did nothing to recover the overdistribution and, in fact, continued to represent in probate court proceedings that the overdistribution was only about $500,000, instead of $1.7 million. Moreover, the Remainder Beneficiaries contend that, as late as 2003, SNB represented to the Remainder Beneficiaries that the overdistribution was about $800,000, when SNB had been advised by an outside accounting firm that the improperly classified assets amounted to about $1.7 million. Similarly, the Remainder Beneficiaries point out that SNB filed an amended petition in the probate action on May 12, 2003, still suggesting that the overdistribution to Charles Williams was only about $800,000. The Remainder Beneficiaries contend that, in amending the Iowa Probate Petition, SNB failed to include any disclosure of over $900,000 in additional overdistributions to Charles Williams, any documents or conclusions provided by the outside accounting firm suggesting that the overdistribution exceeded $800,000, or any indication that the $800,000 figure needed to be adjusted, even though such information and documentation were known to SNB at the time.

From these factual assertions, the Remainder Beneficiaries contend that the amended petition in the Iowa Probate Action is directly relevant to their claims for breach of fiduciary duty and punitive damages. They contend that SNB's "hidden knowledge" about the amount of the overdistribution at the time that SNB filed its amended petition in the Iowa Probate Ac-

tion is relevant and material to their claim that SNB ignored its fiduciary duties and otherwise acted without regard to the consequences of its actions. The Remainder Beneficiaries also dispute the supposed prejudice to SNB of admitting the amended petition, arguing that this evidence may be "prejudicial" to SNB, because it hurts SNB's position, but it is not "unfairly prejudicial" in the context of this case. To the contrary, the Remainder Beneficiaries argue that excluding the amended petition would unfairly deprive them of vital proof for their claim.

### b. Analysis

■ Contrary to SNB's contentions, the court finds that the amended petition is probative of SNB's allegedly culpable conduct, because it suggests that SNB was concealing from the Remainder Beneficiaries and the Iowa Probate Court material information that was known to SNB. See FED. R. EVID. 401 (evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); FED. R. EVID. 402 ("relevant" evidence is generally admissible). Also contrary to SNB's argument, the court finds that, based on the other evidence that the Remainder Beneficiaries have identified, the inferences that the Remainder Beneficiaries wish to draw from the amended petition are not so farfetched that a reasonable juror would find them "wholly unsupported" by the record. Thus, the amended petition does satisfy Rule 401, Rule 402, and the "probative value" side of the balancing test under Rule 403. FED. R. EVID. 401 (defining relevant evidence), 402 (providing that relevant evidence is admissible), and 403 (the court may balance the "probative value" of evidence against its potential for unfair prejudice).

Furthermore, the court finds that there is no danger of *unfair* prejudice to SNB of admitting the amended petition into evidence in this case. FED. R. EVID. 403 (the danger of "unfair prejudice" ·must outweigh the probative value of the evidence for the court to exclude the evidence). SNB contends that evidence of the amended petition would "undoubtedly result in unfair prejudice against SNB, because [the Remainder Beneficiaries'] reference to the Amended Petition would likely cause the jury to falsely infer that SNB intentionally released inaccurate figures to the court in the Iowa Probate Action." SNB's Brief In Support Of Its Motion In Lime To Bar Plaintiffs From Introducing Any Evidence Of Defendant's First Amended State Court Petition, 4. However, the court finds that the amended petition is, indisputably, SNB's representation concerning circumstances that are material here. Also, as the court concluded above, the inferences that the Remainder Beneficiaries wish to draw from those representations are not so wholly unsupported by the record as to make the admission of the amended petition "prejudicial." The likelihood that SNB will have to dispel the inference that it misrepresented material circumstances to the Iowa Probate Court does not constitute "prejudice" where that inference is reasonably supported by the record, and SNB will have the opportunity to demonstrate to the jury why, in its view, the inference is false.

Therefore, SNB's February 1, 2005, Motion In Limine To Bar Plaintiffs From Introducing Any Evidence Of Defendant's First Amended Iowa Probate Court Petition (docket no. 133) will be denied.

### 6. *Growth of trust principal*

The sixth motion before the court is SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Arguing That They Are Entitled To Growth Of The Principal Of The Trust (docket no. 134). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 156).

#### a. *Arguments of the parties*

Reprising one theme of its unsuccessful motion for summary judgment on Count III of the Complaint, SNB argues in support of this motion in limine that Iowa law only entitles contingent remainder beneficiaries to preservation of trust principal, not growth of trust principal. Developing this theme, SNB argues that, had it acted in the way the Remainder Beneficiaries suggest, it would have breached its duty under the trust agreement and applicable law, for example, by breaching its duty of impartiality and its duty to fulfill the intent of the DPW Trust. SNB contends that there is no Iowa decision finding a breach of fiduciary duty by a trustee where, as here, the principal of the trust purportedly grew during the trustee's tenure.

The Remainder Beneficiaries sing a different tune, however, although their melody also reprises a theme of their resistance to SNB's motion for summary judgment. Specifically, they incorporate by reference their arguments in resistance to summary judgment that SNB's failure to balance income and growth interests violates applicable law, the terms of the DPW Trust, and SNB's own admissions about the proper objectives of a trustee.

#### b. *Analysis*

In its summary judgment motion, the arguments reprised here were directed at Count III of the Remainder Beneficiaries' Complaint, the claim of breach of fiduciary duty by favoring the income beneficiary over the Remainder Beneficiaries. That Count alleges that SNB acted in breach of its fiduciary duty by maintaining a trust portfolio that improperly benefited the income beneficiary, Charles Williams, over the Remainder Beneficiaries by investing

the majority of the Trust's assets in fixed income assets and otherwise failing to diversify the Trust assets, with the result that the Trust principal is now some $10 million less than it would have been, if the Trust portfolio had been properly diversified. *See* Complaint, Count III, ¶¶ 52–54.

■■■■ SNB is correct that, under Iowa law, "[a] trustee is under a duty to protect and preserve the trust assets." *In re Lunt's Trust*, 236 Iowa 28, 17 N.W.2d 803 (1945); *see also* RESTATEMENT (SECOND) OF TRUSTS § 176. This duty is not, however, to the exclusion of all other duties. For example, the RESTATEMENT (SECOND) OF TRUSTS imposes a duty of loyalty to the beneficiary to administer the trust solely in the interest of the beneficiary, RESTATEMENT (SECOND) OF TRUSTS § 170; to administer the trust using such care and skill as a person of ordinary prudence would exercise in dealing with his or her own property, *id.* at § 174; in the absence of trust language directing otherwise, when there are two or more beneficiaries, to deal impartially with them, *id.* at § 183; and when those beneficiaries have successive interests, to act with due regard to their successive interests, *id.* at § 232 (although, pursuant to comment *b*, this provision only requires the trustee to preserve trust property for the beneficiary ultimately entitled to the principal of the trust). Such duties are also implicit in the remedies available to beneficiaries. For example, "[e]ven contingent remaindermen are entitled to guard against damage to their interest[s]." *Cox v. Cox*, 357 N.W.2d 304, 306 (Iowa 1984). The Iowa Supreme Court has recognized that the remedies for a trustee's breach of loyalty to the trust include "any loss to the trust estate"; "any profit made [by the trustee] through the breach"; and "a profit that would have accrued to the trust if there had been no breach." *Coster v. Crookham*, 468 N.W.2d 802, 806 (Iowa 1991) (citing RESTATEMENT (SECOND) OF TRUSTS § 205).[2]

SNB has identified no provision of the DPW Trust that derogates from these duties. Although the DPW Trust provided for distributions to the life beneficiary, Charles Williams, SNB has not demonstrated beyond dispute that the DPW Trust unambiguously imposed upon SNB a duty to favor his interests over the interests of the Remainder Beneficiaries. *See* RESTATEMENT (SECOND) OF TRUSTS § 232 (duty of impartiality to successive beneficiaries). Furthermore, the Remainder Beneficiaries have pointed to sufficient evidence to generate a genuine issue of material fact that SNB did not properly diversify the assets of the Trust in the manner that a reasonably prudent person would have done. *See id.* at § 174 (prudent investor rule), and SNB has pointed to no evidence demonstrating that its investment and management choices not to diversify assets were reasonably necessary to serve the purposes of the DPW Trust. In addition, the Remainder Beneficiaries have pointed to sufficient evidence to generate a genuine issue of material fact that SNB did not act impartially in investing and managing trust property to take into account the differing interests of Charles Williams and the Remainder Beneficiaries, where they have pointed to evidence gen-

**2.** Provisions of the version of the Iowa Trust Code that became effective in 2000 also provide that "the trustee shall administer the trust according to the terms of the trust and according to this trust code, except to the extent the terms of the trust provide otherwise," IOWA CODE § 633.4201(1); that the trustee must "diversify the investments of the trust unless the trustee reasonably determines that the purposes of the trust are better served without diversifying," *id.* at § 633.4303; and that, "[i]f a trust has two or more beneficiaries, the trustee shall act impartially in investing and managing the trust property, taking into account any differing interests of the beneficiaries." *Id.* at § 633.4306.

erating a genuine issue of material fact that SNB can only argue that the Trust principal grew by including PICO assets improperly distributed to Charles Williams that have not yet been recovered. *See id.* at § 232 (the trustee must take into account the interests of successive beneficiaries, although, pursuant to comment *b*, this provision only requires the trustee to preserve trust property for the beneficiary ultimately entitled to the principal of the trust). Thus, there is, at the very least, a genuine issue of material fact as to whether SNB fulfilled its duties to preserve Trust assets, to act as a prudent investor would, for example, by diversifying Trust assets, and to make investment and management decisions impartially as between differing interests of beneficiaries.

■ Under these circumstances, the court will not preclude the Remainder Beneficiaries from arguing that SNB was under a duty to preserve and grow the principal of the Trust. Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Arguing That They Are Entitled To Growth Of The Principal Of The Trust (docket no. 134) will be denied.

### 7. The relationship between Doug Palmer and Charles Williams

SNB's next motion is its February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Doug Palmer's Relationship To Mr. Charles K. Williams (docket no. 135). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 160).

#### a. Arguments of the parties

In support of this motion, SNB explains that Doug Palmer was a member of SNB's board of directors and that, prior to Charles Williams's marriage to Dorothy Pritchard Williams, Charles Williams was married to a member of Palmer's family. SNB contends that, after Mr. Williams married Dorothy Pritchard Williams, and until the time of his death, Mr. Williams had no "relationship" whatsoever with the Palmer family, and hence, no legal, social, or professional relationship with Doug Palmer. SNB contends that evidence of any such supposed relationship is irrelevant and highly prejudicial, in that it creates a false appearance of some kind of impropriety. SNB contends that any "relationship" between Charles Williams and Doug Palmer or the Palmer family is too distant and unrelated to have any probative value on any issue in this case and could cause a jury improperly to infer that Mr. Williams had some influence over SNB's board of directors through Palmer.

In response, the Remainder Beneficiaries point out that Charles Williams was married to, and had four children by, Doug Palmer's sister. Thus, Doug Palmer is the uncle of four of Charles's children. Under these circumstances, the Remainder Beneficiaries argue that the Palmer/Williams family relationship bears directly on the issue of whether SNB acted with bias in administering the DPW Trust and, if so, whether its allegedly culpable actions at issue here were negligent or intentional. More specifically, the Remainder Beneficiaries contend that Marilyn Hagberg, who was SNB's trust officer for the DPW Trust, was provided with a family chart for Charles Williams showing his relationship to the Palmer family. The Remainder Beneficiaries contend that these facts make it more probable that the trustee acted in favor of Charles Williams and to the detriment of the Remainder Beneficiaries, who had no relationship with the Palmer family. The Remainder Beneficiaries argue, further, that SNB will not be unfairly prejudiced by this evidence of a relationship between Charles Williams and the Palmer family, because in their view,

the family relationship is not remote or unrelated to the circumstances at issue, nor is it so emotionally-charged in and of itself as to be prejudicial.

### b. Analysis

■ Had the Remainder Beneficiaries put forward no evidence that SNB's trust officers responsible for administering the DPW Trust were actually aware of the relationship between Charles Williams and the family of a member of SNB's board of directors, the court would probably have concluded that the evidence in question in this motion is irrelevant or that, at best, its slight probative value as background information (*e.g.*, on family relationships of the persons involved in the case) is outweighed by the unfair prejudice of an unwarranted inference of some kind of family favoritism in the actions of SNB. However, the Remainder Beneficiaries have pointed to evidence that at least two of the trust officers successively responsible for managing the DPW Trust were aware of a family tree showing Charles Williams's relationship to the Palmer family. Thus, there is at least some probative value to the evidence beyond merely clarifying the family relationships for background purposes, because there may be some legitimate inference that the trust officers were affected by their knowledge of Charles Williams's relationship to the family of a member of SNB's board. *See* FED. R. EVID. 401 (evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

The court recognizes that the Remainder Beneficiaries have not pointed to any record evidence showing that the trust officers acknowledged or denied that their knowledge of the family relationship between Charles Williams and the Palmers had any effect on their management of the Trust, but neither has SNB presented any categorical denial that their knowledge had any such effect. Thus, there is a fact issue—albeit perhaps a tenuous one—as to whether the trust officers' knowledge of Charles Williams's relationship to the Palmer family had any effect on the trust officers' management of the Trust.

Nor is the court convinced that the probative value of this evidence, which may be slight, is outweighed by the potential for *unfair* prejudice. *See* FED. R. EVID. 403 (probative evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice). It may be incumbent upon SNB to demonstrate that the trust officers' knowledge of Charles Williams's family relationship to a member of SNB's board had no effect on management of the trust, but that burden does not amount to "unfair prejudice." To put it another way, the court will not pretry the case on motions in limine, by pre-weighing the evidence on questions that properly belong to a jury, where there is some fair basis for the inference the Remainder Beneficiaries may wish to advocate and no greater showing of prejudice to SNB than SNB has made so far.

Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Doug Palmer's Relationship To Mr. Charles K. Williams (docket no. 135) will be denied.

### 8. SNB's corporate relationship to Security National Corporation

SNB's eighth motion now before the court is its February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Corporate Relationship With Security National Corporation (docket no. 136). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 157).

### a. Arguments of the parties

In support of this motion, SNB explains that it expects that the Remainder Beneficiaries may attempt to support their argument for punitive damages by showing that SNB is a wholly-owned subsidiary of Security National Corporation (SNC), as well as other information about the assets, earnings, and other financial records of SNC.[3] SNB argues that any such reference to the existence or the financial resources of a parent company are irrelevant to the question of whether punitive damages should be awarded, and in what amount, against SNB. SNB contends that the Remainder Beneficiaries will be unable to show any sufficient basis for piercing the corporate veil to allow them to reach the assets of SNC, because there is no basis for concluding that SNB is a "dummy" corporation or the "alter ego" of SNC, or that SNC played any role in the matters at issue in this case. Thus, SNB contends that evidence of the finances of a much larger corporation that is unrelated to this litigation would prejudice SNB on the question of punitive damages.

The Remainder Beneficiaries describe their resistance to this motion as "limited." Specifically, they represent that they do not intend to offer evidence relating to the assets, earnings, or other financial information of SNC for purpose of their claim for punitive damages. However, they point out that they have asserted a claim that, when SNB liquidated assets of the Trust to pay estimated estate taxes, it did not liquidate SNC stock held by the Trust, but instead liquidated other assets, thus improperly favoring SNC's interests. Therefore, they contend that they may properly offer evidence relating to SNC in this limited regard.

### b. Analysis

■ The Remainder Beneficiaries concede, and the court finds, that there has been no attempt to satisfy the requirements for piercing the corporate veil in this case to show that the assets of SNC are relevant to a determination of punitive damages, if any, to be awarded against SNB. *See, e.g., In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000) ("The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required. *C. Mac Chambers [Co. v. Iowa Tae Kwon Do Academy, Inc.]*, 412 N.W.2d [593,] 598 [(Iowa 1987)]. Factors that would support such a finding include (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham. *Id.* (citing *Briggs Transp. Co. [v. Starr Sales Co.]*, 262 N.W.2d [805,] 810 [(Iowa 1978)]).". Therefore, the court will grant SNB's motion to exclude evidence of SNB's corporate relationship to SNC as to any efforts by the Remainder Beneficiaries to use evidence of that relationship or the financial condition of SNC as a basis for awarding punitive damages against SNB.

■ On the other hand, the court finds that the Remainder Beneficiaries may properly introduce evidence that assets of the Trust included securities of SNC corporation, the parent company of SNB, for the limited purpose of showing how the Trust assets were treated, including attempting to show that SNB improperly liquidated other assets rather than SNC

---

**3.** Again, the Complaint originally named Security National Corporation as a defendant, but Security National Corporation has since been dismissed from this action.

securities to pay estate taxes. To this limited extent, evidence that SNC is the parent company of SNB is probative of issues in this case and that probative value is not outweighed by the danger of any unfair prejudice to SNB. *See* FED. R. EVID. 403 (permitting the court to exclude relevant evidence when its probative value is substantially outweighed by a danger of unfair prejudice). Such limited evidence will be admitted for this limited purpose.

Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Corporate Relationship With Security National Corporation (docket no. 136) will be granted in part and denied in part, as explained above.

### 9. Stock indices

The ninth motion now before the court is SNB's February 1, 2005, Motion In Limine To Preclude Use Of The Standard & Poor's 500 Index As A Benchmark For Damages (docket no. 137). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 162).

#### a. Arguments of the parties

SNB seeks an order precluding use of the Standard & Poor's 500 Index (the S & P 500) or any other stock index as a benchmark for damages, by comparing the actual performance of the Trust against such an index, because use of stock indices is irrelevant and prejudicial, where it is not supported by Iowa law, is highly speculative, and would be based solely on conjecture. This motion is a companion to SNB's motion to exclude on various grounds the testimony of Todd Borton, which SNB contends is based on the use of stock indices.

Even if the court does not exclude Mr. Borton's testimony in its entirety, SNB contends that the court should not permit him to testify as to performance of the Trust in comparison to various stock indices, because such testimony uses the wrong measure of damages. SNB argues that the measure of damages for breach of fiduciary duty is the difference between the value of the beneficiary's rights to principal and income before and after the breach, but the Remainder Beneficiaries' interest in the Trust is in preservation of principal, not growth. SNB also argues that Iowa law does not allow a party to construct alleged damages based on an arbitrary index. Even if the court rules that the Remainder Beneficiaries were entitled to lost "growth" of the Trust, SNB contends that the Remainder Beneficiaries cannot base a recovery of "lost profits" solely on conjecture or speculation, and a contention that the performance of the Trust could have met or exceeded the performance of any index is highly speculative. SNB contends that no court has allowed such speculative damages calculations.

In response, the Remainder Beneficiaries argue, first, that SNB had a duty to balance the interests of the income beneficiary of the Trust against the Remainder Beneficiaries' interest in growth, but SNB failed to do so. The Remainder Beneficiaries argue that, as damages for breach of fiduciary duty, they are entitled to the greater of the following: (1) any loss or depreciation in value of the trust estate resulting from the breach of trust; (2) any profit made by the trustee for the breach of trust; or (3) any profit that would have accrued to the trust estate if there had been no breach of trust. In determining what amount the Trust would have earned had the assets been properly invested, the Remainder Beneficiaries contend that the law presumes that the Trust assets would have been treated like other assets invested during the same time in proper transactions in the most profitable of equally plausible alternatives. The Remainder

Beneficiaries contend that the fiduciary has the burden of proving that the assets would have earned less than that and that any uncertainties in fixing damages will be resolved against the wrongdoer. They argue, next, that the S & P 500 has an established reputation as an accurate indicator of market conditions. Thus, that stock index provides an appropriate benchmark for the performance of properly invested Trust assets against which to measure the lost profits from breach of the fiduciary's duty. Contrary to SNB's contentions, the Remainder Beneficiaries cite cases that they contend involved findings that the S & P 500 was an appropriate tool or benchmark for measuring damages for mismanagement of investments.

### b. Analysis

In its disposition of SNB's sixth motion in limine, above, the court dispensed with SNB's contention that the Remainder Beneficiaries are entitled only to preservation of Trust assets, not growth. *See also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985) (recognizing, in a case involving an action by beneficiaries against pension plan trustees for breach of fiduciary duty, that "[o]ne appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust," citing RESTATEMENT (SECOND) OF TRUSTS § 205(c) (1959), and concluding that, "[i]n determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount

is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them."). Therefore, the remaining question is whether the S & P 500 or other stock indices are relevant to a determination of the damages for purported mismanagement of Trust assets.

■ Contrary to SNB's contentions, the court concludes that stock indices are relevant to the determination of damages for mismanagement of investments or trust assets. Courts have recognized, for example, that "[f]inancial services companies, analysts and investors regularly refer to S & P indices, including the S & P 500, as benchmarks for measuring the performance of investments." *McGraw–Hill Cos., Inc. v. Vanguard Index Trust*, 139 F.Supp.2d 544, 546 (S.D.N.Y.2001). Thus, in a case involving the determination of damages from excessive trading and commissions paid to a broker by an investment plan, the court determined that "[t]he plan's loss is properly measured by the difference between the plan's actual performance during the period of excessive trading and that amount it would have earned during this period as measured and adjusted by the movement of an appropriate index reflecting the stock market" and that "the S & P[is] such an appropriate index." *Dasler v. E.F. Hutton & Co., Inc.*, 694 F.Supp. 624, 634 (D.Minn.1988) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985), and *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 327–29 (5th Cir.1981)). This court agrees that the S & P 500 and other stock indices are probative of damages for mismanagement of trust assets as a benchmark or reference for determining how the Trust would have performed if assets had been properly invested. *See* FED. R. EVID. 401 (defining relevant evidence), 402 (providing that relevant evidence is admissible), and 403 (the

court may balance the "probative value" of evidence against its potential for unfair prejudice).

Finally, the court finds that SNB's contentions about the speculative or conjectural nature of investment performance as compared to the actual performance of Trust assets goes to the weight of the evidence of stock indices, rather than the admissibility of such evidence. Thus, SNB will not be unfairly prejudiced by use of stock indices as a benchmark for determining how the Trust would have performed if assets had been properly invested, particularly where SNB is afforded the opportunity to demonstrate that such a benchmark is either unrealistic or too speculative to be instructive. *See* FED. R. EVID. 403 (permitting the court to exclude relevant evidence when its probative value is substantially outweighed by a danger of unfair prejudice).

Therefore, SNB's February 1, 2005, Motion In Limine To Preclude Use Of The Standard & Poor's 500 Index As A Benchmark For Damages (docket no. 137) will be denied.

### 10. Expert testimony of Todd Borton

SNB's penultimate motion is its February 1, 2005, Motion In Limine To Exclude The Testimony Of Todd Borton (docket no. 138). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 165).

#### a. Arguments of the parties

SNB contends that the Remainder Beneficiaries intend to introduce the expert testimony of Todd Borton as to whether SNB properly diversified the Trust investment portfolio to adequately provide for both the income beneficiary and the Remainder Beneficiaries. However, SNB contends that Mr. Borton's report and deposition testimony show that he is really intended as a "damages" expert. SNB,

therefore, makes a two-pronged attack on Mr. Borton's testimony: (1) his conclusions as to the "reasonable value" of the Trust are wholly unreliable and unsupported, and (2) he lacks the proper qualifications as an expert on the subject of damages.

As to the first prong of its attack, SNB contends that Mr. Borton's testimony is so fundamentally unreliable that it can offer no assistance to the jury, because the dollar values stated in his report do not rest on sufficient facts or data and are not the product of reliable principles or methods, but are instead based on unverified information provided by third parties, which he then "plugged into" an "off the shelf" software program, without making any attempt to verify either the original data or the settings of the program. Moreover, SNB contends that Mr. Borton admits that the software was designed to calculate *past* value or damages, not to determine potential *future* returns. SNB next contends that Mr. Borton's determinations of "value" are based on a litany of unreliable methods, including use of software not designed for the purpose for which it was used, use of the S & P 500 index as a benchmark, and failure to take into account several relevant variables that he admits would have affected the outcome. SNB also contends that Mr. Borton's report does not provide the basic information required to show whether his results can be tested.

As to the second prong of its attack, SNB contends that Mr. Borton stated emphatically in depositions that he does not have an opinion as to damages in this lawsuit. However, even had he professed to have such an opinion, SNB contends that he is not qualified as an expert to provide such an opinion. SNB's attack on Mr. Borton's qualifications is that he has no familiarity with personal trust funds, where his own clients have been almost

exclusively ERISA-based trusts, with large institutional clients, not personal trusts with individual beneficiaries. SNB also contends that Mr. Borton has never been tendered to the court as an expert witness.

The Remainder Beneficiaries, however, contend that the court should permit Mr. Borton to testify as an expert in this matter. The Remainder Beneficiaries assert that Mr. Borton, who has more than seventeen years of professional investment management experience, was retained as a rebuttal expert to give his opinion as to the appropriateness or inappropriateness of the asset allocations made by SNB. Thus, his testimony will address whether or not SNB properly diversified the Trust portfolio to provide adequately for both the income beneficiary and the Remainder Beneficiaries. The Remainder Beneficiaries contend that Mr. Borton will offer the following opinions: (1) that SNB improperly classified PICO, a closely-held asset of the Trust and, consequently, biased the Trust's investments to income production to the detriment of the Remainder Beneficiaries; (2) that SNB breached its fiduciary duty by failing to perform a professional evaluation of PICO; and (3) that SNB breached its fiduciary duty by failing to diversify properly the Trust's investments to include growth assets. The Remainder Beneficiaries contend that Mr. Borton also performed an independent calculation of the projected value of the Trust using asset allocation software to demonstrate the impact of SNB's improper conduct on the value of the Trust, and that his calculations are consistent with the projected value of the Trust provided by the Remainder Beneficiaries' damages expert. All of these opinions, the Remainder Beneficiaries contend, are within the expertise of a professional investment manager.

Couching their arguments in terms of the requirements of Rule 702 of the Feder-al Rules of Evidence, the Remainder Beneficiaries argue, first, that Mr. Borton is qualified by experience and training to render an expert opinion on SNB's investment decisions relating to the administration of the Trust; Mr. Borton relied on the same information available to SNB, so that his data is not "unreliable," and he relied on recognized principles of trust management to determine the appropriate blend of income and growth investments; Mr. Borton properly included the projected value of the Trust to prove the detrimental impact of SNB's improper investment choices on the remaindermen; and that Mr. Borton's experience with ERISA trusts instead of personal trusts, at most, goes to the weight of his testimony, not its admissibility. Indeed, a recurrent theme in the Remainder Beneficiaries' arguments is that SNB has asserted arguments that properly go to the weight of Mr. Borton's testimony, not to exclusion of his testimony.

### b. Analysis

As mentioned above, in reference to the testimony of Mr. Cain, Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Unlike the dispute concerning Mr. Cain's testimony, the court concludes that SNB's challenges to Mr.

Borton's testimony do fall within the purview of Rule 702.[4] This court recently explained in detail the standards for admissibility of expert testimony under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in *Engineered Products Co. v. Donaldson Co., Inc.*, 313 F.Supp.2d 951 (N.D.Iowa 2004), and *Pioneer Hi–Bred International, Inc. v. Ottawa Plant Food, Inc.*, 219 F.R.D. 135 (N.D.Iowa 2003). Thus, the court will only summarize those standards briefly here.

■ In brief, then, Rule 702 requires the trial court to act as a "gatekeeper," admitting expert testimony only if it is both relevant and reliable. *Engineered Prods. Co.*, 313 F.Supp.2d at 1009 (quoting *Pioneer Hi–Bred Int'l, Inc.*, 219 F.R.D. at 138). Expert testimony should be admitted if (1) it is based on sufficient facts, (2) it is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Id.* (quoting *Pioneer Hi–Bred Int'l, Inc.*, 219 F.R.D. at 138, which parses the language of Rule 702 in this way). Rulings on the admissibility of expert testimony are reviewed for abuse of discretion. *Id.* at 1010 (still quoting *Pioneer Hi–Bred Int'l, Inc.*, 219 F.R.D. at 139).

■ As in *Engineered Products*, this court finds that SNB is clearly unhappy with Mr. Borton's conclusions and has cloaked that unhappiness in challenges to Mr. Borton's "reasoning and methodology," *id.* at 1011, not to mention challenges to the facts on which he relies and his qualifications. *See* FED. R. EVID. 702 (stating qualification and foundation requirements for expert testimony). Here, the

court has already determined that reliance on stock indices as a benchmark for performance of the Trust is not inappropriate. The court concludes that SNB's other challenges to the bases for Mr. Borton's analysis and the principles and methods he used to reach his conclusions are matters that lie within " 'the province of the jury, whose job it is to decide the weight that should be accorded evidence.' " *Engineered Prods. Co.*, 313 F.Supp.2d at 1011 (quoting *United States v. Vesey*, 338 F.3d 913, 916–17 (8th Cir.2003)). The court also finds that Mr. Borton's evidence is plainly relevant to the question of whether or not SNB made appropriate investment management decisions and whether those decisions had an impact on the value of the Trust, that such evidence will serve to aid the trier of fact, and that Mr. Borton's extensive training and experience in trust investment management, albeit only in the related field of ERISA trust investment management rather than personal trust management, qualify him as an expert in trust investment management. *Id.* Just as plainly, SNB has identified substantial grounds for challenging the weight to be given to Mr. Borton's evidence, including the fact that Mr. Borton apparently has worked almost exclusively in another area of trust management, ERISA plans rather than individual trusts. *Id.* As in *Engineered Products*, however, the court concludes that "[t]his ... is a case in which vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are not only traditional, but appropriate means of attacking what [SNB] contends is shaky evidence." *Id.* (citing *Daubert*, 509 U.S. at 595–96, 113 S.Ct. 2786; *Vesey*, 338 F.3d at

---

**4.** The parties did not request a hearing on SNB's challenge to Mr. Borton's testimony. "[T]he district court is not always required to hold such a hearing prior to qualifying an expert under Rule 702 of the Federal Rules of

Evidence." *United States v. Robertson*, 387 F.3d 702, 704 n. 2 (8th Cir.2004) (citing *United States v. Solorio–Tafolla*, 324 F.3d 964, 965–66 (8th Cir.2003)).

917). SNB's motion to exclude Mr. Borton's testimony will not be granted on the basis of failure to satisfy Rule 702 requirements.

Perhaps more troubling to the court, if not the parties, is SNB's contention that Mr. Borton was never properly designated as an expert in this case, a matter to which the parties, perhaps, give far less attention than the court believes that the issue deserves. SNB does not attempt to explain how it was harmed by the failure to designate Mr. Borton properly and the Remainder Beneficiaries do not respond to the contention that Mr. Borton was never properly designated by explaining how and when Mr. Borton was designated; why he was not, if he was not; or why he should nevertheless be allowed to testify. Instead, they simply state that Mr. Borton was "retained" as a rebuttal expert. *See* The Remainder Beneficiaries' Resistance To Defendant's Motion In Limine To Exclude Expert Testimony Of Todd Borton, 2.

As this court also explained in *Engineered Products,*

[T]he Eighth Circuit Court of Appeals has applied a 'harmless or substantially justified' standard to untimely disclosures of evidence, *see [Firefighters Inst. for Racial Equality ex rel. Anderson v. City of St. Louis,* 220 F.3d 898, 902–03 (8th Cir.2000) (*FIRE*), *cert. denied,* 532 U.S. 921, 121 S.Ct. 1359, 149 L.Ed.2d 288 (2001))], while this court has used a similar, but more expansive, four-factor test to determine whether or not to permit the testimony of an untimely disclosed expert, which involves consideration of the reason for failing to name the witness, the importance of the witness's testimony, the opposing party's need for time to prepare for the testimony, and whether a continuance would be useful. *Jochims [v. Isuzu Motors, Ltd.],* 144 F.R.D. [350,] 353–54 [(S.D.Iowa 1992)] (citing *Patterson [v. F.W. Woolworth Co.],* 786 F.2d [874,] 879 [(8th Cir.1986)]).

*Engineered Prods. Co.,* 313 F.Supp.2d at 1013; *see also id.* at 1004–06 (explaining these standards in greater detail). Although the parties have not really tried to address these standards, the court nevertheless concludes that any failure to designate Mr. Borton properly as an expert also does not provide a basis to exclude his testimony.

The court finds that SNB cannot convince the court that SNB has suffered such harm from the improper designation of Mr. Borton that his testimony should be excluded. SNB plainly knew of the Remainder Beneficiaries' intention to call Mr. Borton as an expert, both parties had the opportunity to review his report and to depose him concerning his opinions, and SNB has had ample time to prepare its response to Mr. Borton's testimony and to rehearse its arguments concerning the weight to be given that testimony, for example, in the briefing of its motion in limine, so that SNB is not "surprised" by sudden disclosure of Mr. Borton's opinions. *Id.* at 1006. For these reasons, the court will not exclude Mr. Borton's testimony on the ground that he was not properly designated.

Therefore, SNB's February 1, 2005, Motion In Limine To Exclude The Testimony Of Todd Borton (docket no. 138) will be denied.

### 11. *Expert testimony of Dominic Campisi*

SNB's final motion now before the court is its February 1, 2004, Motion In Limine To Exclude Testimony Of Dominic Campisi (docket no. 139). The Remainder Beneficiaries resisted this motion on February 11, 2005 (docket no. 164).

### a. Arguments of the parties

SNB seeks to exclude the testimony of the Remainder Beneficiaries' rebuttal expert Dominic Campisi on the ground that his testimony does not meet any of the requirements of Rule 702. Mr. Campisi is a partner in the law firm of Evans, Latham & Campisi in San Francisco, California, and he practices primarily in the field of probate and trust litigation. As such, SNB seeks to exclude his testimony, first, on the ground that it will not assist the trier of fact, because it will merely assert legal theories and conclusions of law, where it is the court's role to define the legal standards applicable to this case. Even where Mr. Campisi addresses mixed questions of law and fact, SNB contends that his ultimate conclusions are "legal." Second, SNB also asserts that Mr. Campisi's testimony should be excluded, because he is not qualified as an expert on trust administration or creation, where he is a litigator who neither administers trusts nor advises clients on the creation and administration of trusts. Third, SNB seeks to exclude Mr. Campisi's testimony on the ground that his conclusions are not reliable or trustworthy, where he admits that he has no knowledge of Iowa trust law, and he has not distinguished between operation of the Trust under the versions of the Iowa Probate Code in effect before and after 2000. Finally, SNB contends that Mr. Campisi's opinions should be excluded, because they would be highly prejudicial, owing to his tendency to "editorialize" that SNB's breaches of fiduciary duty were "willful" or "intentional."

In response, the Remainder Beneficiaries contend that Mr. Campisi is "unquestionably" qualified to give his expert opinion on trust administration based on his more than thirty-seven years of trust and probate experience, consisting of litigation of more than thirty-five trust and probate cases. Indeed, the Remainder Beneficia-ries point out that Mr. Campisi routinely trains bank trust officials about liability, investment, management, and conflict issues involving trusts. Even supposing Mr. Campisi's lack of experience were borne out by the record, the Remainder Beneficiaries contend that such a supposed deficiency would go to the weight of his testimony, not its admissibility. The Remainder Beneficiaries also dispute SNB's contention that Mr. Campisi would only testify to inadmissible legal conclusions, because expert testimony in specialized areas of the law is admissible. The Remainder Beneficiaries contend that Mr. Campisi will testify, in part, to rebut the testimony of SNB's own experts concerning SNB's fiduciary duties, so that it is improper to deprive the Remainder Beneficiaries of a rebuttal expert. Similarly, the Remainder Beneficiaries contend that Mr. Campisi's testimony will assist the trier of fact to determine the proper characterization and investment of Trust assets, which may include proper expert testimony concerning industry standards. Finally, the Remainder Beneficiaries contend that SNB's assertions of unfair prejudice are conclusory at best.

### b. Analysis

Although the parties addressed the issues in a different order, the court concludes, first, that Mr. Campisi is qualified as an expert on trust creation and administration, based on his experience and education. *See* FED. R. EVID. 702. The Remainder Beneficiaries have demonstrated that Mr. Campisi has been involved in litigating, as well as educating trust officers and advising clients concerning, issues of trust creation and management. The court also agrees with the Remainder Beneficiaries that SNB's complaint that Mr. Campisi is a litigator rather than a trust administrator goes to the weight to be given to his opinions, not

their admissibility. The court also agrees that some of Mr. Campisi's expected testimony, such as testimony concerning the determination of the proper characterization and treatment of trust assets, would address issues on which expert testimony is likely to assist the jury. *Id.*

A closer question is whether Mr. Campisi's testimony improperly trespasses on the role of the court. SNB is correct that the Eighth Circuit Court of Appeals has explained that "expert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *Southern Pine Helicopters, Inc. v. Phoenix Aviation Mgrs., Inc.*, 320 F.3d 838, 841 (8th Cir.2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438–39 (8th Cir.1995)). On the other hand, "industry practice or standards may often be relevant in cases like the present one, and expert or fact testimony on what these are is often admissible." *Id.* (citing *Wood v. Minnesota Mining & Mfg.*, 112 F.3d 306, 310 (8th Cir.1997)). Thus, although Rule 704 permits an expert to testify as to the ultimate issue that is to be decided by a trier of fact, "[a] trial court may ... exclude opinion testimony if it is so couched in legal conclusions that it supplies the fact finder with no information other than what the witness believes the verdict should be." *Williams v. Wal–Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir.1990). Even with this limitation, however, "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.* (citations and internal quotation marks omitted).

In the present case, the court concludes that much of the testimony by Mr. Campisi that SNB contends would be objectionable does sail perilously close to the line, if not over the line, between what is testimony on an ultimate issue and what is testimony on a conclusion of law. *Southern Pine*

*Helicopters, Inc.*, 320 F.3d at 841. Indeed, the challenged testimony appears likely to provide the factfinder with little information other than what Mr. Campisi believes the verdict should be. *Cf. Williams*, 922 F.2d at 1360 (such "expert" testimony is inadmissible). Nor is the court convinced that the challenged testimony can simply be characterized as opinions concerning "industry standards or practices." *See Southern Pine Helicopters*, 320 F.3d at 841 (expert testimony on such matters may be admissible). Ultimately, however, the court concludes that it must reserve for trial the question of the extent of the "expert" testimony that Mr. Campisi will be permitted to present. This is so, because the parties appear to agree that Mr. Campisi will only testify as a "rebuttal" expert, so he may have no ground to opine on prohibited legal conclusions, if SNB's own experts are not permitted to stray into such forbidden territory.

Therefore, ruling on SNB's February 1, 2004, Motion In Limine To Exclude Testimony Of Dominic Campisi (docket no. 139) will be reserved until trial, at which time SNB must reassert its challenges to any testimony of Mr. Campisi that SNB finds objectionable.

### B. The Remainder Beneficiaries' Motions

The court turns, next, to the two pretrial motions filed by the Remainder Beneficiaries. Both of the Remainder Beneficiaries' motions seek to preclude SNB from arguing that it is entitled to certain offsets against its potential liability in this case.

### 1. Offset of sums the income beneficiary could have claimed

The Remainder Beneficiaries' first motion in limine is their February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Off-

set Its Potential Liability For Amounts Of Charles K. Williams['s] Five and Five Power And Excluding Any Evidence Relating Thereto (docket no. 153). SNB resisted this motion on February 17, 2005 (docket no. 168).

### a. Arguments of the parties

In this motion, the Remainder Beneficiaries seek an order precluding SNB from arguing or presenting evidence that it is entitled to offset against its potential liability the amounts that the income beneficiary of the Trust, Charles K. Williams, would have received had he exercised his "five and five powers" under the terms of the Trust. The "five and five powers" permitted Charles K. Williams to withdraw up to five percent of the principal of the Trust in any given year. The Remainder Beneficiaries explain that the successor trustee of the Charles K. Williams Trust (CKW Trust) has resisted SNB's action in state court to recover the improperly disbursed sums from the CKW Trust by asserting such an argument. More specifically, in the state-court action, the successor trustee has argued that Charles Williams attempted to exercise his "five and five powers" in 1992 to account for some of the alleged overdistribution, so that the CKW Trust is entitled to set off the amounts available by exercise of the "five and five powers" against the sums that SNB claims should be returned to the DPW Trust. The Remainder Beneficiaries explain that they expect SNB also to argue that, had Charles Williams not received improper distributions from the DPW Trust between 1991 and 1999, he would have exercised his "five and five powers" under the terms of the Trust to receive distributions from principal.

The Remainder Beneficiaries contend that SNB should be precluded from asserting that Charles Williams exercised or intended to exercise his "five and five power" in any year other than 1985, 1986, 1997, 1998, 1999, 2000, 2001, or 2002. In support of this motion, the Remainder Beneficiaries argue that it is improper to speculate on what Charles Williams might have done, but did not actually do, and that the requirements of the Trust for exercise of the "five and five power" were not followed, so no valid exercise of those powers occurred. Indeed, the Remainder Beneficiaries point out that SNB admits that Charles Williams did not actually exercise his "five and five powers" in any year other than those identified above.

In response, SNB contends that evidence that Charles Williams would have exercised his "five and five power" had he not received the PICO distributions is both relevant and admissible. SNB contends that the challenged evidence is admissible pursuant to Rule 406 of the Federal Rules of Evidence as evidence of Charles Williams's habit, practices, and customs to show his tendency, intent, or motive. The evidence is relevant, SNB argues, because his use of his "five and five powers" in years when he did not receive PICO distributions makes it more probable that he would have exercised those powers every other year if he had not received PICO distributions. SNB contends, further, that there is sufficient foundation for the evidence of "habit" that it intends to introduce, because the record makes clear that Charles did not exercise the "five and five power" in the years he received PICO distributions, but did in years when he did not receive PICO distributions. Thus, if Charles Williams had never received the PICO distributions, or had been required to return them promptly, SNB contends that he would have continued to invade the principal of the Trust. Finally, SNB contends that an assertion that Charles Williams did not, in fact, exercise his "five and five power" in the years in question is simply a misdirection to confuse the issue

of the admissibility of the "habit" evidence in question.

### b. Analysis

Rule 406 of the Federal Rules of Evidence provides for the admissibility of "habit" evidence, as follows:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

FED. R. EVID. 406. The Advisory Committee noted general agreement "that habit evidence is highly persuasive as proof of conduct on a particular occasion," FED. R. EVID. 406, Advisory Committee Notes, and other courts and commentators agree. See, e.g., Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1524 (11th Cir. 1985) ("Generally, habit evidence is highly persuasive as proof of conduct on a particular occasion, and its admission depends on the 'degree of regularity of the practice and its coincidence with the occasion.' McCormick on Evidence, § 195 n. 16. Habit evidence is considered to be highly probative and, therefore, superior to character evidence because 'the uniformity of one's response to habit is far greater than the consistency with which one's conduct conforms to character or disposition.' McCormick on Evidence, § 195 at 463.").

As the Advisory Committee explained at the time Rule 406 was proposed, " ' "Habit" ... describes one's regular response to a repeated specific situation.' " Id., Advisory Committee Notes (quoting McCORMICK ON EVIDENCE, § 162 at 340). Similarly, although the text of the Rule seems to relate "habit" to individuals and "routine practice" to organizations, the Eighth Circuit Court of Appeals excluded evidence of an individual's conduct pursuant to Rule 406 when the proponent of the evidence failed to elicit evidence concerning that individual's "routine practice." See United States v. Mulder, 147 F.3d 703, 707–08 (8th Cir.1998). Thus, the Eighth Circuit Court of Appeals, at least, appears to treat "habit" and "routine practice" as synonymous.

The Eighth Circuit Court of Appeals has also explained that "[t]he foundation for Rule 406 evidence can be established by lay opinion," so long as the lay opinion complies with Rule 701, which requires only that the witness's testimony "be rationally based on perception and helpful to the determination of a fact at issue." Maynard v. Sayles, 817 F.2d 50, 52 (8th Cir.), vacated on reh'g other grounds, 831 F.2d 173 (8th Cir.1987). Although the Eleventh Circuit Court of Appeals recognized that there is no precise formula for determining when conduct is so consistent as to become a "habit," " 'adequacy of sampling and uniformity of response' are controlling considerations." Loughan, 749 F.2d at 1524 (quoting Reyes v. Missouri Pac. R. Co., 589 F.2d 791, 795 (5th Cir.1979), in turn quoting Advisory Committee Notes to the Rule). That court also provided this guidance for determining the sufficiency of proof of "habit":

> We stress that "habit or pattern of conduct is never to be lightly established, and evidence of example, for purpose of establishing such habit, is to be carefully scrutinized before admission." Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 511 (4th Cir.1977). Such an attitude toward the evidence of habit is based on "the collateral nature of [such] proof, the danger that it may afford a basis for improper inferences, the likelihood that it may cause confusion or operate to unfairly prejudice the party against whom it is directed." Wilson, 561 F.2d at 511 (citing Nelson v. Brunswick Corp., 503 F.2d 376, 380 (9th

Cir.1974)). It is only when examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct," that examples are admissible. *Wilson*, 561 F.2d at 511 (citing *Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1158 (2d Cir.1968)). *See also 2 Wigmore, Evidence* § 376 (3rd ed.1940). *Loughan*, 749 F.2d at 1524.

■ In the present case, SNB has suggested that it was the habit or routine practice of Charles Williams to exercise his "five and five powers" to invade the corpus of the Trust. The court finds that SNB's identification of evidence that Charles Williams *did* exercise his "five and five powers" in every year in which he *did not* receive an overdistribution from PICO receipts is an adequate sampling showing a uniform response to suggest that the evidence of "habit" is admissible, even giving such evidence "careful scrutiny." *See id.* Indeed, invading the corpus of the trust seems to have been Charles Williams's " 'regular response to a repeated specific situation.' " FED. R. EVID. 406, Advisory Committee Notes (quoting MCCORMICK ON EVIDENCE, § 162 at 340). On the present record, the "examples [of the exercise of the 'five and five powers' when there were no other distributions] are 'numerous enough to base an inference of systematic conduct' " upon them. *Loughan*, 749 F.2d at 1524 (quoting *Wilson*, 561 F.2d at 511). Thus, the problem is not that SNB cannot establish that exercise of Charles Williams's "five and five powers" was "habit," but whether SNB's intended use of that "habit" evidence is permissible under Rule 406.

Rule 406 provides that habit evidence may be used "to prove that the conduct of the person ... on a particular occasion was in conformity with the habit." FED. R. EVID. 406. Thus, the Rule uses "habit" evidence to prove what someone *actual-*

*ly did.* On the other hand, SNB contends that the "habit" evidence in question here is relevant to prove what Charles Williams *would have done* had he not received, or had he promptly returned, overdistributions of PICO assets. Thus, SNB seeks to use "habit" evidence to prove instances of *probable conduct* under *hypothetically similar circumstances*, instead of instances of *actual conduct* under *actually similar circumstances*.

The Remainder Beneficiaries contend that the inference SNB seeks to draw from its "habit" evidence is too speculative to be admissible, for example, because there are too many unknown variables to predict how Charles Williams would have behaved, had he not received the PICO distributions. The Remainder Beneficiaries suggest, for instance, that in *Top of Iowa Cooperative v. Schewe*, 135 F.Supp.2d 969 (N.D.Iowa 2001), this court excluded as too speculative evidence of what a grain seller might have done in response to certain market conditions. The court finds, however, that not only did the decision in *Schewe* have nothing to do with "habit" evidence, but the Remainder Beneficiaries have mischaracterized this court's conclusion in that case.

In *Schewe*, the cooperative *argued* that the grain seller's evidence of what the market for corn on the Chicago Board of Trade (CBOT) did in 1997 and thereafter was irrelevant and inadmissible, because any action that the grain seller would have taken from 1997 onward regarding his grain contracts would have been pure speculation. *Schewe*, 135 F.Supp.2d at 976 (also characterizing the cooperative's argument as "what [the grain seller] would have done in response to those prices is speculative"). What this court ultimately held, however, was that evidence of what the corn market on the CBOT did *was* relevant to the grain seller's damages. *Id.*

The court did not rule either way on the speculativeness of evidence of what the grain seller would have done.

The court must look elsewhere for guidance on the question of the admissibility of "habit" evidence as suggesting what a party *would have done*. Although a court may properly exclude vague, self-serving, and speculative evidence of what a party would have done under different circumstances, *see Lee v. Wal–Mart Stores, Inc.*, 34 F.3d 285, 290 (5th Cir.1994) (citing *Bridgen v. Scott*, 456 F.Supp. 1048, 1063 (S.D.Tex.1978)), the question is whether there is sufficient fact-based evidence from which to draw a reasonable inference of probable conduct in similar circumstances, that is, whether the evidence is sufficient to establish a "minimum necessary probability." *See Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 456 (D.C.Cir.1990). This court concludes that evidence of a "habit" would, in most circumstances, provide sufficient factual basis for a reasonable inference about *what someone would have done* in like circumstances. To put it another way, it seems to the court that there is no greater leap of faith involved in relying on "habit" evidence to prove an instance of *probable conduct* under *hypothetically similar circumstances*, than is involved in using "habit" evidence to prove *actual conduct* under *actually similar circumstances*, as expressly sanctioned by Rule 406. In either case, the jury must use "habit" evidence as a predictor of conduct in similar circumstances, and the certainty of the prediction or strength of the inference necessarily depends upon (1) how strong the evidence of "habit" is, and (2) how similar the circumstances in which the "habit" is displayed are to the circumstances (actual or hypothetical) in which the jurors are trying to predict the actor's conduct. *Compare Drabkin*, 905 F.2d at 456 (for evidence to be probative of what someone would have done, it must be sufficient to establish a "minimum necessary probability"), *with Loughan*, 749 F.2d at 1524 ("examples [of a purported 'habit'] [must be] 'numerous enough to base an inference of systematic conduct'" upon them) (quoting *Wilson*, 561 F.2d at 511).

The court concluded above that SNB has pointed to sufficient evidence to establish Charles Williams's "habit" of invading the corpus of the Trust when he found the regular distributions from the Trust to be insufficient. What remains, then, is to determine whether the instances in which SNB contends that Charles Williams would also have invaded the corpus of the Trust are sufficiently similar to the instances in which he actually did so. SNB's pre-trial showing is that only one variable distinguished the circumstances in which Charles Williams exercised his "five and five powers" from those in which he did not: whether or not he received a PICO distribution. Thus, the court concludes that there is sufficient evidence of "habit" and sufficient evidence of similar circumstances to admit SNB's "habit" evidence to try to convince a jury of what Charles Williams *would have done* in the absence of PICO distributions. The Remainder Beneficiaries, of course, will be entitled to attempt to show that the inference is unwarranted, for example, because more variables than the lack of PICO distributions were involved in years in which Charles Williams did not exercise his "five and five powers." However, the court will not exclude pre-trial any and all attempts to use the "habit" evidence in question to show that Charles Williams probably would have invaded the corpus of the Trust in the absence of PICO distributions.

A further consequence of this conclusion is that SNB is also entitled to argue, based on its "habit" evidence, that SNB is entitled to an offset of what Charles Williams would have obtained from the Trust princi-

pal by exercising his "five and five powers," in years he did not do so because of overdistributions from PICO, against the overdistribution that SNB admittedly made to Charles Williams from the PICO receipts. It for a jury to determine, however, whether the "habit" evidence is sufficiently convincing concerning what Charles Williams would have done to allow such an offset in their determination of what damages, if any, the Remainder Beneficiaries suffered as a result of SNB's improper distributions of PICO receipts.

Therefore, the Remainder Beneficiaries' February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Offset Its Potential Liability For Amounts Of Charles K. Williams['s] Five And Five Power And Excluding Any Evidence Relating Thereto (docket no. 153) will be denied.

### 2. Offset of trustee fees

The final motion now before the court is the Remainder Beneficiaries' February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Offset Its Potential Liability For Trustee Fees And Excluding Any Evidence Relating Thereto (docket no. 154). SNB resisted this motion on February 16, 2005 (docket no. 167).

#### a. Arguments of the parties

The Remainder Beneficiaries contend that SNB intends to introduce evidence and testimony that, had it not over-distributed the PICO receipts to Charles Williams, SNB would have earned approximately an additional $92,000 in trustee fees. However, the Remainder Beneficiaries seek an order precluding SNB from arguing or presenting evidence that it is entitled to an offset against its potential liability the amount of additional trustee fees that it would have earned had it not breached its fiduciary duties. In support of this motion, the Remainder Beneficia-

ries argue that, if a trustee commits a breach of trust, the court has the discretion to deny a trustee all compensation, reduce the trustee's compensation, or allow the trustee full compensation. The Remainder Beneficiaries contend that this rule applies regardless of the trustee's good or bad faith. On the other hand, they contend that, if the trustee repudiates the trust, misappropriates trust property, or intentionally or negligently mismanages the whole trust, the rule is that the trustee will ordinarily be allowed no compensation. The Remainder Beneficiaries urge that, in the circumstances of this case, SNB is not entitled to offset against its potential liability any of the additional fees that it would have earned had it not improperly over-distributed PICO receipts to Charles Williams, because SNB did not render such services and because of the egregious nature of its breach of fiduciary duties.

In response, SNB contends that this motion is not a motion in limine, but an attempt to decide whether SNB is entitled to assert a defense as a matter of law. Such a motion is inappropriate, SNB contends, because the question of whether or not SNB breached any alleged fiduciary duty is a question of fact for the jury, and because the law does not support a ruling that the court must deny SNB all of its fees or an offset of some of those fees. In support of the latter argument, SNB argues that the court has the discretion to grant full compensation under the facts of the particular case. Therefore, SNB argues that it is for the jury to decide both whether SNB violated its fiduciary duties and, if so, whether SNB is nevertheless entitled to receive reasonable compensation.

#### b. Analysis

The court finds that each of the parties is half right. The Iowa Supreme

816

Court has treated breach of fiduciary duty as a question of fact for the jury. *See, e.g., Wilson v. IBP, Inc.,* 558 N.W.2d 132, 139 (Iowa 1996) (evidence was sufficient to present a jury question on whether or not there was a breach of fiduciary duty); *Kimmel v. Iowa Realty Co., Inc.,* 339 N.W.2d 374, 382 (Iowa 1983) (concluding that a jury could have found a breach of fiduciary duty on the record presented); *Poulsen v. Russell,* 300 N.W.2d 289, 294 (Iowa 1981) (finding "substantial evidence in the record to establish a question for the trier of fact on whether [the defendant] breached his fiduciary duty to the [plaintiffs]"); *see also McCracken v. Edward D. Jones & Co.,* 445 N.W.2d 375, 380–81 (Iowa Ct.App.1989) (concluding that the trial court properly submitted to the jury the questions of whether a fiduciary duty existed under the facts of the case and whether the defendant had breached that fiduciary duty). The court concludes that the record in this case is such that the court cannot find, as a matter of law, that SNB breached its fiduciary duty, thereby taking the question of breach of duty away from the jury. Therefore, the question of whether or not SNB is entitled to an offset of any or all trustee fees notwithstanding a breach of fiduciary duty is not ripe until and unless *the jury* finds a breach of fiduciary duty.

■ On the other hand, whether or not a breaching trustee is entitled to any or all of its fees is a question for *the court,* not the jury. *See In re Woltersdorf,* 255 Iowa 914, 124 N.W.2d 510, 510 (Iowa 1963) ("The matter of fees for executors and trustees rests within the sound discretion of the trial court."); *In re Guardianship and Conservatorship of Liggett,* 327 N.W.2d 779, 781–82 (Iowa Ct.App.1982) (compensation for fiduciaries who breach their fiduciary duties is a matter in the court's discretion); *see generally* RESTATEMENT (SECOND) OF TRUSTS § 243 ("If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation."). Consequently, if the jury finds that SNB breached its fiduciary duty, it will be for the court to determine, posttrial, whether or not SNB should be allowed to offset some, all, or none of its fees against its liability for breach of fiduciary duty.

■ Because the question of any offset is ultimately a question for the court, not the jury, SNB should be precluded from arguing to the jury that it is entitled to such an offset pursuant to Rule 402, because evidence of an offset for trustee fees is simply not probative of any issue before the jury. *See* FED. R. EVID. 402 (relevant evidence is generally admissible, irrelevant evidence is not). Similarly, supposing that there is any probative value to the issue of the offset of trustee fees, such argument should be precluded pursuant to Rule 403, because introduction of the issue of an offset for trustee fees would likely mislead or confuse the jurors as to the determinations properly before them. *See* FED. R. EVID. 403 (permitting exclusion of otherwise relevant evidence if its probative value is outweighed by the danger, *inter alia,* of misleading or confusing the jury).

Therefore, the Remainder Beneficiaries' February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Offset Its Potential Liability For Trustee Fees And Excluding Any Evidence Relating Thereto (docket no. 154) will be granted to the extent that SNB will be precluded from presenting argument or evidence *to the jury* concerning such an offset.

### III.  CONCLUSION

Upon the foregoing, as explained more fully herein, the pending motions in limine are resolved as follows:

1. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To Defendant's Insurance (docket no. 129) is **denied,** where the only evidence of SNB's insurance that the Remainder Beneficiaries intend to offer is relevant to issues in the case, and that evidence is not offered merely to imply that damages should be increased or decreased because SNB had insurance.

2. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Settlement Agreements (docket no. 130) is **granted.**

3. SNB's February 1, 2005, Motion In Limine To Preclude Reference To Notes And Observations Of Paul Cain As Opinions Or Conclusions (docket no. 131) is **denied.**

4. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Subsequent Modifications To Its Internal Policies (docket no. 132) is **granted.**

5. SNB's February 1, 2005, Motion In Limine To Bar Plaintiffs From Introducing Any Evidence Of Defendant's First Amended Iowa Probate Court Petition (docket no. 133) is **denied.**

6. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Arguing That They Are Entitled To Growth Of The Principal Of The Trust (docket no. 134) is **denied.**

7. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Doug Palmer's Relationship To Mr. Charles K. Williams (docket no. 135) is **denied.**

8. SNB's February 1, 2005, Motion In Limine To Preclude Plaintiffs From Introducing, Or Making Any Reference To, Defendant's Corporate Relationship With Security National Corporation (docket no. 136) is **granted in part and denied in part,** as explained herein.

9. SNB's February 1, 2005, Motion In Limine To Preclude Use Of The Standard & Poor's 500 Index As A Benchmark For Damages (docket no. 137) is **denied.**

10. SNB's February 1, 2005, Motion In Limine To Exclude The Testimony Of Todd Borton (docket no. 138) is **denied.**

11. Ruling on SNB's February 1, 2004, Motion In Limine To Exclude Testimony Of Dominic Campisi (docket no. 139) is **reserved until trial,** at which time SNB must reassert its challenges to any testimony of Mr. Campisi that SNB finds objectionable.

12. The Remainder Beneficiaries' February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Offset Its Potential Liability For Amounts Of Charles K. Williams['s] Five And Five Power And Excluding Any Evidence Relating Thereto (docket no. 153) is **denied.**

13. The Remainder Beneficiaries' February 9, 2005, Motion In Limine To Preclude Defendant From Arguing That It Is Entitled To Offset Its Potential Liability For Trustee Fees And Excluding Any Evidence Relating Thereto (docket no. 154) is **granted** to the extent that SNB will be precluded from presenting argument or evidence *to the jury* concerning such an offset.

**IT IS SO ORDERED.**